## FIRST NAT. BANK *v.* BISSELL, FOSS & HUNTER.

*(Circuit Court, D. Colorado.  June 26, 1880.)*

1. CONTRACTS—AGREEMENT TO NEGOTIATE FOR PROPERTY.—An agreement between two or more persons to negotiate for the purchase of specific property, does not vest any right in either, unless such agreement is consummated by a purchase of the property.

2. SAME—AGENT—TRUSTEE.—An agent for the purchase of property cannot be declared a trustee for his principal, when he repudiates the agency, and purchases the property with his own funds.
   *Burden* v. *Sheridan*, 36 Iowa, 125.

3. TENANTS IN COMMON—PURCHASE BY CO-TENANT.—A purchase by one co-tenant of the interest of another does not enure to the benefit of all the remaining tenants in common.

4. MINING PARTNERSHIP—RETIRING PARTNER.—In a mining partnership the firm has no right of pre-emption as to the interests of retiring partners in the mines.

5. PURCHASE OF MINING INTERESTS—CONTRACT—CO-TENANT—PARTNER. Therefore, a tenant in common of mining property, and a partner in the working of the mine, cannot claim any benefit in the clandestine purchase of the interests of certain co-tenants and retiring partners by two of his co-tenants and partners, although he had previously agreed with one of the purchasers to negotiate for the purchase of such interests for their joint benefit, and was then willing to pay his share of the purchase money.

In Equity.

*L. C. Rockwell,* for plaintiff.

*W. S. Decker* and *D. P. Dyer,* for defendants.

HALLETT, D. J.   In the month of September, 1878, Charles R. Bissell, Simon H. Foss, and Absalom V. Hunter owned in equal parts three-fourths of the Winnemuc mine, and three-fourths of seven-sixteenths of the New Discovery mine, near Leadville, in this state.   The remaining one-fourth interest in the same property was owned by Edward Handley, George W. Robertson, and Amos B. Rawlings, and all were engaged in working the mines, which were very productive.   In their relations to each other as owners of the property the parties named were tenants in common; and in respect to their operations in working and mining on the property they were mining partners.   As to their partnership relation, nothing more is shown than the fact that they were working the

mines and sharing in the proceeds according to their respective interests, so that the relations of the parties were not the subject of express contract, and must be ascertained from their ownership of the property and their conduct in working it. In the month of September, 1878, the parties were greatly harassed by adverse claimants of the property, and Handley, Robertson, and Rawlings became anxious to dispose of their interest. The Winnemue property was known to be valuable, having yielded about $40,000, which was paid for the seven-sixteenths interest in the New Discovery in this month of September. There was also in bank to the credit of the company something like $16,000, one-fourth of which belonged to the Handley party. Bissell and Foss, who were on the ground, were anxious to purchase the interest so offered, not solely on account of its intrinsic value, but also to prevent adverse claimants from acquiring an interest in their title, and thus securing a foothold on their side. So anxious were they that they agreed to decry the property as much as possible, and to magnify the dangers besetting it, in order to increase the alarm of the Handley party and induce them to sell at a low price. The subject of the purchase became a matter of consultation and conference between Bissell and Foss, and they agreed as to the propriety of making it, if the property could be had at a reasonable price. But it does not appear that there was any definite understanding as to what sum should be paid for it, or where the money for that purpose should be obtained. Whether the money in bank to the credit of the company was available for that purpose, or had been pledged to persons who had entered themselves as surety in certain attachment suits which had been brought against the company, has become a subject of controversy in the record. Probably it was a part of the plan to represent to the Handley party that the money in bank was so pledged in order to induce them to sell at a low price. To propose to pay for the property out of the company's funds would have opened the eyes of the Handley party to the nature of the transaction, if anything could produce that result. Hence the necessity for some pretence that the money

was not then in the command of the parties, and that, like the property, it was beset with dangers of which no man could then form a just estimate. However this may be, there was no understanding that this fund should be used in the purchase of the property, nor was there any agreement as to how the money should be raised for that purpose. As the result of the several interviews between Bissell and Foss on the subject of the purchase, it may be said that they were united in a purpose to get the Handley interest for partnership account, if it could be obtained at a cost of $30,000 or less, but nothing was done towards raising the money. With this end in view negotiations took place with members of the Handley party, but nothing was accomplished until a few days later, when Hunter arrived at Leadville. Whether Hunter was then advised of what had taken place between Bissell and Foss and the Handley party, we are not informed; but upon his arrival a new arrangement was made between himself and Foss for obtaining the Handley interest, and apparently without the knowledge of Bissell. This was, in substance, that Hunter was to assume to sell to Foss his one-fourth interest in the property for $15,000, in order to induce the Handley party to sell their one-fourth interest at the same price; and Hunter was to furnish the money for the Handley interest, and have two-thirds of that one-fourth, or two-twelfths of the whole,—the remainder of that one-fourth, or one-twelfth of the whole, to go to Foss. This trick was successful, and Foss was made the grantee of one-half interest in the property from Hunter, Handley, Robertson, and Rawlings, of which he a few days later reconveyed five-twelfths to Hunter. In this performance Handley, Robertson, and Rawlings received $300 from Foss and $14,700 from Hunter, who pretended to act in that matter as the agent of Foss, but really furnished the money himself. Before the transaction was fully completed by the payment of the money, and probably on the day the deed was made and before it was delivered, Bissell was advised of it, and at once asserted his right to an equal share in the property with Hunter and Foss, and expressed his willingness to pay his part of the purchase

money. That claim was denied, and the property having been sold and the proceeds deposited in the First National Bank of Denver, this suit was brought by Foss and Hunter against Bissell and the bank to determine the right to the fund. The bank was dissatisfied with its position in the suit, and filed its cross-bill to compel the others to interplead and adjust their differences and exonerate the bank from liability. Issue was joined on that bill, but the contestants have not acceded to its prayer otherwise than by the original pleadings. No question is now made, however, as to the form of the issue, and none will be considered by the court.

The matter in controversy is whether, upon what took place in the purchase of the Handley interest in the mines, Bissell is in equity to be regarded as a party thereto. Out of the relations of the parties as mining partners and tenants in common, or joint tenants of the three-fourths interest in the property, as well as from the conference and agreement between Foss and Bissell in respect to the purchase of the Handley interest, it is contended that a duty arose on the part of Foss towards his associates which was violated by him in making the purchase for Hunter and himself only. In other words, the position is assumed that relations of trust and confidence existed between the parties by which the acts of each, relating to the common property, should be controlled, and whatever was done by any of the owners should be taken to be for the advantage of all; or that Bissell was too confiding and was overreached by Foss, who, while claiming to act for all, sought to appropriate the purchase to Hunter and himself. Familiar principles are invoked in support of this position, and we shall best ascertain how far they may be applicable to the case by considering them with reference to the attitude of the parties in the several positions in which we find them in the record. And first let us put out of view their associations as mining partners and tenants in common, and consider whether, by the conference and agreement to purchase the property between Foss and Bissell, anything was established upon which the claim of the latter may rest. If two or more persons agree

amongst themselves to purchase property for their joint account, and the purchase is accordingly made by one or more of them on behalf of all, the liability of each to pay his share of the purchase money, and his right to an interest in the property, cannot be controverted. So, also, if two or more persons enter into a contract with another to purchase property, all matters being fully arranged in the agreement, the equal right of all vendees to proceed in the execution of the contract may be conceded. To illustrate that proposition, if the Handley party had agreed with Bissell, Foss, and Hunter to sell to them their interest in the mines, no one of the vendees could have taken the title to himself under that contract until default by the party excluded in some matter to which he was bound by the terms of the agreement. Again, if one take unto himself a title which he has purchased with the money of another, he shall be a trustee for the true owner, who may rightfully follow his fund, however it may be miscarried. But the record presents no one or more of these facts. There was, indeed, an agreement between Foss and Bissell to purchase the Handley interest, if that may be called an agreement which lacks the essential features of a price for the property and money to pay for it. But Handley, Robertson, and Rawlings were not parties to that agreement, and therefore it was not in itself an agreement to purchase, but to negotiate with them for the property. In that form it presents no feature which can affect the title to the property. At most it was an agreement between intending purchasers, which could give no right to either until it should be consummated in the purchase of the property. If we regard Foss and Bissell as agreeing to an agency in respect to the purchase of the property, the case is not different; for if one, who is clearly an agent of another to purchase property, repudiate the agency and act for himself, using his own funds, he cannot be declared a trustee for his principal. *Burden* v. *Sheridan*, 36 Iowa, 125. A different rule appears to be laid down in Story's Eq. Jur. § 1211a, but its limitation will be found in another section of the same volume—section 1201a.

An attempt was made, in argument at the bar, to put this case upon the footing of a numerous class in the books in which real property was granted upon a parol pledge from the grantee to make some disposition of it; as where a son has been granted an estate upon condition that he will support his father during his life-time, or where a devisee has promised the testator to divide the estate with another. In all such cases the trust may be established by parol, and the trust itself stands on the plainest principles of justice. But to point out the distinction between those cases and the case under consideration can hardly be necessary. Foss received nothing from Bissell on account of the purchase of the property, nor did he take the property with the understanding that he should admit Bissell to an interest to it. If he had received the property upon a pledge to hold it for Bissell, or to make some other disposition of it, his failure to do so would be a fraud upon the grantors as well as the beneficiary, of which either might complain, and the principle invoked would be applicable. But here there was nothing of that kind. The property was sold to Foss, who in fact received it, and Bissell comes to complain that he was not admitted to the purchase, as by his agreement with Foss he should have been. However he may have been misled by the conduct of Foss, he was not in fact a purchaser, and Foss did not receive the property to his use in any way, and therefore he acquired no interest in it.

If, now, we turn to the co-tenancy of the parties, we find in that relation nothing of weight respecting the question under consideration; for although tenants in common are not at liberty to assail the common title by which they all hold, they may deal with each other touching their respective interests. Freeman's Co-tenancy, 165. While Bissell, Foss, and Hunter, and the Handley party, were all bound to maintain the common title, each was at liberty to purchase from the other in the same manner as a stranger might purchase from any or all of them, *Alexander* v. *Kennedy*, 3 Grant's Cases, 380. It has never been claimed that a purchase by one co-tenant of the interest of another would enure to the

benefit of all who should retain their interest, and certainly there is nothing in the relations of such owners to support that doctrine.

The limitations to individual action on the part of the members of a partnership in respect to those matters which may or may not be within the scope of the partnership business are in many cases not easily defined. We know, however, that fidelity to the partnership, is the highest duty of its members, and that no member can be allowed to turn the partnership concerns to his own account; and, whenever a. member is found to be seeking a private advantage from partnership dealings, the courts are prompt to correct such an abuse of the confidence reposed in him by his associates. A familiar application of the principle is found in the cases cited by counsel, it which it is held that a partner cannot in his own name renew the lease of the premises used by the firm. In New York the doctrine was applied to a case in which the renewal did not begin until the copartnership had expired by its own limitation, and the reasons assigned by the court are entirely satisfactory. *Mitchell* v. *Reed*, 61 N. Y. 123. The position assumed in these cases is that the renewal is ancillary to the original lease, and so far connected with it that it shall be regarded as a part of it; and, as the original lease was owned by the firm, any attempt by a member to appropriate the renewal to his own use is a direct conversion of the property of tne firm. In other words, the doctrine is that a member of a firm shall not be permitted to take unto himself the property of the firm, and the renewal of the lease whereof the firm holds the original is such property, and therefore it is protected for the use of the firm. To invoke the principle, however, it is obviously necessary to show that the malversation was of the partnership funds or effects, for if it be otherwise no member of the partnership can complain.

And this brings us to inquire, what right or interest of the copartnership of which he was a member was used or asserted by Foss in making the purchase of his associates' interest in. the mines? Is it true that in a mining partnership the firm.

has a right of pre-emption as to the interests of retiring partners in the mines? The answer is not doubtful. Where the partnership is formed expressly to work mines, and the mines are held by lease, the lease and renewal of it is, as the courts have held, partnership property. But, in the case at bar, the partnership arose out of a community of ownership in the mines, and the parties were, in a very large sense, involuntary associates. They came together upon the ground that they were tenants in common of the mines, and not upon any agreement to engage in the business of mining. Indeed, they had no agreement whatever respecting their joint operations; but they stood solely on their ownership of the property, in consideration of which they united for the purpose of working it. They were partners in the working, but not in the ownership, of the mines, and their firm was a thing of the hour, without hope of existence. In that kind of association it cannot be said that there is in the collective body a right to acquire new interests which its members are bound to respect. The object of the partnership was to take out ore, and in all things directed to that end each member owed allegiance to the company. Beyond that they were entirely free to act touching their interest in the mines, as well as other individual property. Each member held his interest in the mines in his own right, with power to dispose of it as he should think proper, and each was free to deal with his associate or with a stranger in respect to such interest. So, also, each member was at liberty to buy from his associates, and thus enlarge his interest in the whole property without reference to the partnership relation. On the whole case no reason can be found for saying that the purchase of the Handley interest enured to the benefit of Bissell, or that he had any share in it. If, in making it, Foss violated his promise to Bissell, in that there was moral wrong, and possibly there may be some remedy for the breach. But it cannot be said that by such promise only Bissell, who furnished no part of the purchase money, acquired an interest in the mines.

The money will be awarded to Foss and Hunter.